IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
UNITED STATES OF AMERICA      :
                              :        SUPERSEDING
              v.              :        1:08CR384-1
                              :
DEMARIO JAMES ATWATER         :
```

<u>RESPONSE TO DEFENDANT'S MOTION TO TRANSFER VENUE</u>

The United States of America, by and through Anna Mills Wagoner, United States Attorney for the Middle District of North Carolina, respectfully responds to Defendant's Motion to Transfer Venue.  For reasons identified and discussed below, the motion should be denied.

Article III, Section 2 of the Constitution of the United States requires criminal trials to "be held in the State where the said Crimes shall have been committed ...."

The capital case venue statute provides that a "trial of offenses punishable with death shall be had in the county where the offense was committed, where that can be done without great inconvenience." 18 U.S.C. § 3235 (2008).  In addition, under Rule 18 of the Federal Rules of Criminal Procedure, "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed.  The court must

set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice."

Case law has established, however, that Section 3235 does not vest a defendant with an absolute right to a trial within the county where the offense was committed. Brown v. United States, 257 F. 46 (5th Cir. 1919), cert. granted and reversed on other grounds, 256 U.S. 335 (1921). The right is a qualified one, and if such a setting works as "a great inconvenience" the matter may be set elsewhere. Id. The district court's decision in this regard will not be disturbed absent an abuse of discretion. Id. At least one circuit court has held that the "inconvenience" referred to in this section is that of the United States. United States v. Parker, 103 F.2d 857, 861 (3rd Cir.), cert. denied, 307 U.S. 642 (1939). In the instant case there is no federal courthouse in Orange County even were this Court inclined to set the matter for trial there. This Court maintains its chambers in Winston-Salem. The courtroom to be used for the trial has recently undergone extensive renovations which allow for the use of courtroom presentation equipment. A setting in Orange County would also work an inconvenience for the government, which maintains staffed offices only in

2

Greensboro and Winston-Salem.[1]  Both counsel for Defendant Atwater practice law in Winston-Salem.  For these reasons, a setting in Winston-Salem would be of greatest convenience to all parties.

Independent of Section 3235, there is a preference in the law for criminal trials to be conducted in or near the geographical location in which the charged crimes were committed.  For the rare exception to that preference, Rule 21(a) of the Federal Rules of Criminal Procedure provides that the district court must, upon motion of defendant, transfer a case to another district "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

Pretrial publicity, even pervasive and adverse publicity, does not inevitably lead to an unfair trial. Nebraska Press Association v. Stuart, 427 U.S. 539, 554 (1976).  A defendant who contends that prejudice from pretrial publicity should be presumed has an "extremely high" burden.  United States v. McVeigh, 153 F.3d 1166, 1182

---

[1] The U.S. Attorney's Office presently has an unstaffed branch office in Durham, North Carolina, but this office will be closed in the near future after a decision was made not to renew the lease. The Durham location is a one-room office with very little space.

3

(10th Cir. 1998), cert. denied, 526 U.S. 1007 (1999).  Such
a  presumption of prejudice is "rarely" applicable and is
reserved for "extreme situations." United States v. Campa,
459 F.3d 1121, 1143 (11th Cir. 2006)(en banc)(quoting Mayola
v. Alabama, 623 F.2d 992, 997 (5th Cir. 1980), cert. denied,
451 U.S. 913 (1981)); see also United States v. Childress,
58 F.3d 693, 706 (D.C. Cir. 1995) (presumption is "reserved
for only the most egregious case"), cert. denied, 516 U.S.
1098 (1996); Dobbert v. Florida, 432 U.S. 282, 303
(1977)("Unfairness of constitutional magnitude not be
presumed in the absence of a 'trial atmosphere ... utterly
corrupted by press coverage'")(quoting Murphy v. Florida,
421 U.S. 794, 798 (1975)).    In the Fourth Circuit, the
determination of whether a change of venue is required as a
result of pretrial publicity involves a two-step process.
United States v. Higgs, 353 F.3d 281, 307 (4th Cir. 2003),
cert. denied, 543 U.S. 999 (2004)(citing United States v.
Bakker, 925 F.2d 728, 732 (4th Cir. 1991)).  First, the
district court must determine "whether the publicity is so
inherently prejudicial that trial proceedings must be
presumed to be tainted," and, if so, grant a change of venue
prior to jury selection. Id. However, "[o]nly in extreme
circumstances may prejudice to a defendant's right to a fair

4

trial be presumed from the existence of pretrial publicity itself." Wells v. Murray, 831 F.2d 468, 472 (4th Cir. 1987); see also United States v. Jones, 542 F.2d 186, 193 (4th Cir.), cert. denied, 426 U.S. 922 (1976)(noting that cases in which prejudice will be presumed will be rare). "Ordinarily, the trial court must conduct a voir dire of prospective jurors to determine if actual prejudice exists." Bakker, 925 F.2d at 732. If "voir dire reveals that an impartial jury cannot be impanelled," the trial court should then grant the motion. Id.

Mere knowledge of the case is not enough to disqualify a potential juror, provided that juror can set aside whatever prior knowledge they may have and decide the case based upon the evidence. Irvin v. Dowd, 366 U.S. 717, 722-23 (1961). The Fourth Circuit has noted that fair trials are possible in highly publicized cases, noting the trials of "Oliver North, Lyndon LaRouche, and Jim Bakker as examples." Washington Post Company v. Hughes, 923 F.2d 324, 329 (4th Cir.), cert. denied, 500 U.S. 944 (1991).

Defendant has attached two exhibits in support of his position that pretrial publicity in the instant case is presumptively prejudicial: the results of a defense-commissioned survey concerning pretrial publicity, and

5

examples of media coverage related to the death of Eve Carson. Neither exhibit, however, is persuasive.

A. *The survey*. The defense has submitted as part of its motion to change venue a survey prepared by Dr. Richard Seltzer. Prior to addressing the merits of the defense study, a review of Dr. Seltzer's methodology is instructive. In paragraph 3 of his "Declaration," Dr. Seltzer cites to a "Zimbio" article calling Defendant Atwater a "scumbag," further claiming that this is "indicative of the strong negative emotions on this case". "Zimbio" is an online magazine service and is in no way a "legitimate" news organization. Further, few if any articles from legitimate news sources identify Defendant Atwater in this way.

Paragraph four identifies the type and dates of research. The final survey was conducted between June 4, 2009, and July 13, 2009, roughly 15 to 16 months after Ms. Carson's death and between 10 and 11 months before trial. The size of the survey pool is reported to be 1,401 persons.

Paragraphs ten and eleven identify the methodology. For each call the surveyor asked to speak to the youngest male currently residing in the household who was a U.S. citizen and at least 18 years of age. If no eligible male was in the residence, only then did the surveyor ask to

6

speak to the youngest female with the same qualifications. Paragraph thirteen states that "[t]his method of selecting respondents within each household improves participation among young people who are typically under-represented using other random selection methodologies."

There is no explanation for the methodology of preferring the youngest man over eighteen in every household, and failing in that, the youngest woman over eighteen in every household. A random sample would seem to be just that, and not reached by including a preference in the pool to be questioned. While this methodology might be preferred by the Pew Research Center, this is not a political survey, like much of the work performed by that group. Additionally, nowhere in the materials are the ages of the male versus female responders noted.

Paragraph thirty-two identifies the questions asked of the individuals polled and contains the raw answers provided. Some questions were open-ended and some were closed-ended. Paragraph thirty-three provides "content analysis" for the questions asked in paragraph thirty-three. These are summarized in Chart 3. One major problem with the survey as it was conducted is that the participants were never provided (before responding) with the basic tenets

regarding the trial of a criminal case - that an indictment is not evidence of guilt; that the government must prove the defendant's guilt beyond any reasonable doubt; that the defendant is presumed innocent; and that the defendant can refuse to testify or offer evidence.

That "Mr. Atwater has already been tried, convicted and sentenced to die in the North Carolina court of public opinion," as the defense claims in their motion, is hardly supported by the data. Indeed, the answers to some of the more salient questions support the United States' position that the motion for change of venue should be denied and that a fair and impartial jury can be seated in the Middle District of North Carolina. For example, according to Chart 2 of Dr. Seltzer's survey slightly more than four out of five people in the Middle District reported having heard of the case, unaided.[2] Yet, according to the Chart 5, only slightly more than one out of five think that, based upon their knowledge of the case, Demario Atwater is <u>definitely</u> guilty of murdering Eve Carson, while slightly more than two out of five people report that they do not know.[3] And while

_____

[2] Paragraph 29 of Dr. Seltzer's declaration identifies a sampling error of plus or minus 5 points for the Middle District.

[3] Although the term "murder" is used throughout Dr. Seltzer's study, Defendant Atwater is obviously not charged with that

8

81.8% of the Middle District population eligible for jury service in this case reported unaided case awareness, more than half of that number (41.3%) had not formed any opinion as to Demario Atwater's guilt.

The U.S. Census Bureau estimates that the total population of the counties which comprise the Middle District of North Carolina is roughly 2,731,063 as of July 1, 2008.[4]  Approximately 23.8% of district residents are under 18 years old, and thus ineligible to serve as jurors. This leaves a potential jury pool of approximately 2,080,284 adults.  The ultimate jury pool is difficult to determine numerically.  Jurors in the Middle District are drawn from both voter and North Carolina Division of Motor Vehicles (NCDMV) rolls.  Records provided by the North Carolina Board of Elections show that as of January 11, 2010, there were 1,810,440 registered voters in the Middle District of North Carolina.  According to NCDMV records, as of January 21, 2010, 2,055,795 in the Middle District of North Carolina have either a North Carolina driver license or

---

offense, but rather with other federal violations resulting in the death of Eve Carson. Whether this mis-characterization skews the results is unknown.

[4] See, www.quickfacts.census.gov. For compilation of relevant data also refer to Attachment A.

identification card.  Assuming, arguendo, the statistical
validity of the defense survey, and a potential jury pool of
2,080,284, approximately 387,612 potential jurors are
unfamiliar with or unaware of the case against Defendant
Atwater.[5]  Likewise, approximately 1,626,782 potential
jurors have not yet decided that Defendant Atwater is
definitely guilty of murdering Eve Carson[6] and approximately
859,157 potential jurors report that they simply "don't
know."[7]  Given the raw data it seems highly unlikely that
the Court could not seat twelve completely fair and
impartial jurors to hear the case.

Even excluding 57.1% of potential jurors who indicated
they either <u>definitely</u> or <u>probably</u> thought Defendant Atwater
is guilty of murdering Eve Carson, that would still leave a
potential jury pool of approximately 892,442 people from
which to select a jury.[8]  These figures do not support a

---

[5] <u>See</u>, Seltzer Declaration, p.7, Chart 2, Q3 - "Heard-unaided."  100 - 81.8% = 18.2%.  18.2% x 2,080,284 = 378,612.

[6] <u>See</u>, Seltzer Declaration, p.11, Chart 5, Q11 - "Definitely guilty."  100 - 21.8% = 78.2%.  78.2% x 2,080,284 = 1,626,782.

[7] <u>See</u> Seltzer Declaration, p.11, Chart 5, Q11 - "Don't know." 41.3% x 2,080,284 = 859,157.

[8] <u>See</u> Seltzer Declaration, p.11, Chart 5, Q11 - "Definitely or probably guilty."  100 - 57.1% = 42.9%.  42.9% x 2,080,284 = 892,442.

10

presumption that extreme prejudice exists such that defendant would be denied a fair trial. If anything, these figures support the notion that, with probing questions about pretrial publicity, an impartial jury can be impaneled.

As for the death penalty findings, the percentages provided in the survey are hardly a surprise. The question was posed, "If Demario Atwater is convicted of premeditated murder, which penalty do you believe Mr. Atwater should receive?" According to Dr. Seltzer's study, 38.7% of those surveyed indicated "definitely death penalty" and 18.0% indicated "probably death penalty." There are two issues of concern here: first, much as in the context of the guilt questions, the individuals polled have been given no instruction in the death penalty process, and so hardly can answer the question intelligently; and secondly, national opinion polls have long reflected that a majority of Americans are in favor of capital punishment. A telephone poll conducted by Rasmussen Reports (dated 11/12/2009) finds that 61% of Americans are in favor of capital punishment, 23% oppose capital punishment, and 16% are undecided. Men are slightly more likely to favor capital punishment, as are whites versus African Americans (65% versus 45%). The pro-

11

death penalty findings are somewhat tempered in this same poll, which also reports that 73% of those polled are concerned that some may be executed for crimes they did not commit, with 40% of this number being very concerned.

Hunter Bacot, the Director of the Center for Public Opinion Polling and an Associate Professor in Political Science and Public Administration at Elon University, identified a number of shortcomings in Dr. Seltzer's study, primarily based on methodology, survey questions and technique. His summary findings regarding methodology are as follows:

> The survey methodology is based on customary and acceptable methods and procedures. There are some areas of concern in reviewing the statistical and methodological approaches used to acquire opinions on this survey. These concerns involve the explicit identification of subsamples, the methodology, statistical measures, and procedures used in the content analysis (as it is not included), and questions about the methods used in constructing the population from which the sample is drawn.[9]

A summary of Professor Bacot's findings regarding survey questions and technique includes the following:

Based on an assessment of the survey instrument

---

[9] The United States is prepared to present evidence as to specific methodology flaws in Dr. Seltzer's poll at an evidentiary hearing or, with the consent of the defense and the Court, by submitting in camera a summary of Professor Bacot's findings and conclusions.

provided for analysis, many conventional and
accepted practices advised for the construction of
survey questions are not observed; these are
detailed in the report. Given the issues
enumerated in this report, results from the "Venue
Survey" as presented for evaluation are largely
without merit and conclusions based on these
result should be dismissed. Moreover, the
percentages reported for each question are
meaningless as these are derived from faulty
question construction. Recognizing the
proliferation of questionnaire construction
concerns, it is my professional opinion that these
results are fraught with error and provide little
information of sufficient integrity upon which to
draw reasonable conclusions about peoples'
opinions on the topics posed to them in this
survey.[10]

It is, of course, entirely proper for this Court to

decline to rely on public opinion polls such as the one

prepared by Dr. Seltzer.  See Campa, 459 F.3d at 1145-46

(district court did not err by refusing to rely on public

opinion poll); United States v. Malmay, 671 F.2d 869, 875-76

(5th Cir. 1982)(district court did not err by denying change

of venue motion when public poll revealed only general

public awareness of the crime rather than widespread belief

about defendant's guilty); United States v. Haldeman, 559

F.2d 31, 64, n.43 (D.C. Cir. 1976)(trial judge had

---

[10] The United States is prepared to present evidence as to
specific instrument and question construction flaws in Dr.
Seltzer's poll at an evidentiary hearing or, with the consent of
the defense and the Court, by submitting in camera a summary of
Professor Bacot's findings and conclusions.

13

discretion to ignore a "poll taken by private pollsters and paid for by one side," given adequacy of jury instructions), cert. denied, 431 U.S. 933 (1977); and United States v. Long Elk, 565 F.2d 1032, 1041 (8th Cir. 1977)(noting the district court declined to rely on public opinion poll).

B. *Media coverage.* Defendant also cites to "highly inflammatory" articles in the news media in support of his motion for change of venue. What the data reflects is a high degree of awareness of the case and a great deal of sympathy for the victim. This includes citations to articles: that Atwater was charged with the killing of Duke student Abihijit Mahato (Defense motion at pp. 9-10); that state authorities failed to adequately confine and supervise Atwater (Id., at pp. 11-12, 33-34); that Atwater had a previous criminal history (Id., at pp. 11-12); that Atwater was on parole at the time of the alleged offense (Id., at pp. 12-13); a list of Atwater's infractions while in the North Carolina Department of Corrections (Id., at pp. 13-14); copies of search warrants from the investigation (Id., at pp. 30-32); Ms. Carson's autopsy report (Id., at pp. 32-33); various criminal pleadings in the case (Id., at pp. 34-37); and statements

14

from government officials (<u>Id</u>., at pp. 37-39).[11]

The vast majority of the news coverage has been factually accurate, an important factor when considering pretrial publicity. <u>See</u> <u>United States v. Murphy</u>, 421 U.S. 794, 802 (1975)(news articles "largely factual in nature").

Most of media coverage occurred soon after the offense was committed (or "immediate[ly]," as the defense characterizes it). As the Supreme Court, in holding that the passage of four years between two murder trials rebutted any presumption of unfair prejudice observed, "that time soothes and erases is a perfectly natural phenomenon, familiar to all." <u>Patton v. Yount</u>, 467 U.S. 1025, 1034 (1984)(voir dire testimony and record of publicity did not reveal a "wave of public passion" such that fair trial unlikely by jury as a whole.) In reviewing the newspaper coverage of the offense related to the defense submissions, in the Middle District of North Carolina 85% of the print articles were published in calendar year 2008, as opposed to 15% in calendar year 2009. For the Eastern District of North Carolina the numbers are similar, 82% in 2008 versus

---

[11] Defendant's motion in this section is captioned "[T]he Government has caused additional prejudicial publicity." There has been no allegation that the United States has made extrajudicial comments prohibited by Department of Justice policy and Middle District Local Criminal Rule 57.2.

15

18% in 2009, and in the Western District of North Carolina 88% in 2008 versus 12% in 2009.

And potential jurors are not required to be totally ignorant of the facts and issues involved in high profile cases:

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Irvin, 366 U.S. at 722-23; see also Murphy, 421 U.S. at 800 (same).

Given the potential jury pool for the case, anecdotal examples of citizen outrage are not of any assistance in a fair determination of the issue.   A portion of the present motion relates to comments posted online, including comments posted on blogs.  A telephone poll conducted by Rasmussen Reports (dated 10/7/2009) finds that just 10% of Americans say they or a family member have their own blog. Additionally, only 20% of Americans report that they

16

regularly read blogsites.  Finally, only 28% of  adults say
that they are at least somewhat confident in the reliability
of reports from bloggers and internet journalists - and just
2% are very confident in them.

In support of their position that the pretrial
publicity in the instant case has caused venue to be
"inherently improper" in the Middle District, thus allowing
this Court to transfer venue even without an evidentiary
hearing, the defense cites to United States v. Jones, 542
F.2d 186 (4th Cir.), cert. denied, 426 U.S. 922
(1976)(Defense motion, p.53).  In Jones, however, the
district court observed it to be the "rare case" (and
certainly not the case before it) where there would be a
showing of inherently prejudicial publicity which had so
saturated the community, so as to have a probable impact
upon the prospective jurors. Id., at 193.  The Court in
Jones also found that the
" ... proper manner for ascertaining whether the adverse
publicity may have biased the prospective jurors was through
the voir dire examination." Id.  Jones also cited with
approval United States v. Nix, 465 F.2d 90, 96 (5th Cir.),
cert. denied, 409 U.S. 1013 (1972), reh. denied, 409 U.S.
1119 (1973), for the proposition that whether or not the

facts in a particular case meet the criteria of "inherently prejudicial publicity" is ordinarily committed to the discretion of the trial court.

The cases of Irvin, 366 U.S. 717 (1961), Rideau v. Louisiana, 373 U.S. 723 (1963), and Sheppard v. Maxwell, 384 U.S. 333 (1966), are three cases the defense cites to as similar to the instant case. (Defense motion, pp. 53-54). These cases are distinguishable. In Irvin there was a "barrage" of publicity six to seven months prior to trial, publicity which included information about the defendant's background, offered plea agreement, and confession to police. 366 U.S. at 725-27. The prosecutor's office had issued press releases, which were intensively publicized, that the defendant had confessed to six murders. Id., at 719-20. Additionally, 268 of 430 members of the Irvin venire reported having "fixed opinions" about his guilt, and fully 90% of the venire entertained some opinion as to guilt ranging in intensity from mere suspicion to absolute certainty. Id., at 727. Indeed, of the prospective jurors, "[a] number admitted, if they were in the accused's place in the dock and he in theirs on the jury with their opinions, they would not want him on a jury." Id.

In Rideau the publicity included a televised broadcast

18

of the defendant confessing his guilt to police in a videotaped interrogation.  Three of the jurors in the case admitted having heard the confession, and two members of the jury were members of the sheriff's office which had taken the confession.[12] Id., at 725.  The court held the proceedings to be a "hollow formality," where the "real trial had occurred when tens of thousands of people, in a community of 150,000, had seen and heard the defendant admit his guilt before the cameras." Id., at 726.

Sheppard involved the high-society murder of a pregnant woman in a Cleveland suburb.  Newspaper accounts described the defendant, the victim's husband, as a "Lothario" with multiple lovers, called into question his account to police, repeatedly called for an inquest and chided the defendant for refusing a lie-detector test. 384 U.S. at 338-40.  One news account even stated that he [Sheppard] was now "proved under oath to be a liar." Id., at 341.  Every juror, save one, stated they had heard or read about the case. Id., at 345.  The names and addresses of the venire had also been published in the local paper, resulting in prospective jurors being contacted prior to their service. Id., at 342.

---

[12] Having exhausted his peremptory challenges, Rideau attempted to strike the two sheriff's deputies for cause.  These challenges were denied by the court.

19

The defense highlights three cases identifying the controlling precedent for presumed prejudice, however, in none of the cases was prejudice found.  See United States v. Rewald, 889 F.2d 836, 863-64 (9th Cir. 1989)(no presumption or prejudice where 12% of jurors excused for pretrial publicity, citing cases as high as 26% where no prejudice found), opinion amended, 902 F.2d 19 (1990), and cert. denied, 498 U.S. 819 (1990); United v. Dischner, 974 F.2d 1502, 1524-25 (9th Cir. 1992)(no presumption even where 69% of registered voters, from where jury poll drawn, were familiar with the investigation related to the case they were being selected for, 64% of that number believed there to be "serious dishonesty" involved with the targets of the investigation, and fully 90% believed the dishonesty to involve public officials), cert. denied, 507 U.S. 923 (1993); and Goss v. Nelson, 439 F.3d 621, 631-32 (10th Cir. 2006)(timing of news articles, dispersed nature of news articles, infrequency of local news publications, and that articles were factual and non-inflammatory failed to establish presumed prejudice).  In fact, despite the proliferation of the news media and its technology, the Supreme Court has not found a single instance of presumed prejudice since the Sheppard case in 1966. McVeigh, 153 F.3d

20

1166 (10th Cir. 1998).

In identifying recent cases dealing with the issue of presumed prejudice, the defense cites to United States v. Cortez, 251 F.R.D. 237 (E.D. Tex. 2007). However, Cortez provides little guidance. In that particular case a defendant was charged in the Sherman Division, where he had been depicted on film and in photographs as a "prime suspect" in a quadruple murder in McKinney, Texas, even though he had not been charged. The court specifically observed, "[t]he question of whether that publicity renders virtually impossible a fair trial by an impartial jury drawn from the Sherman Division is an open one." Id. (emphasis added). There was no indication the government either joined in the motion or opposed it.

Likewise, the factors in the case of Daniels v. Woodford, 428 F.3d 1181 (9th Cir. 2005), cert. denied, 550 U.S. 968 (2007), do not weigh in Defendant Atwater's favor. First, the coverage in the instant case has largely been factual and non-inflammatory in nature and could hardly be characterized as creating a "huge wave of public passion." As the defense states, the suspects in Ms. Carson's killing were alleged to be black and Defendant Atwater was identified as the killer - both facts which are supported by

21

the expected trial evidence.  According to defense submissions, and as set out earlier, in the Middle District 85% of the articles were written in 2008, the year Ms. Carson was killed.  Secondly, most of the news coverage is factual in nature, relying on public information, such as search warrants and DOC records, as well as pleadings from the federal prosecution.  Thirdly, there is very little in the way of non-admissible evidence adduced from the press coverage.

Other cases cited by the defense in support of the motion to change venue also are of little assistance in deciding the matter.  United States v. Moody, 762 F. Supp. 1485 (N.D. Ga. 1991)(motion to change venue unopposed by government involving mail bomb deaths of 11th Circuit Judge Robert Vance and civil rights attorney Robert Robinson, inordinate and widespread media attention caused, in part, by government agents); Coleman v. Kemp, 778 F.2d 1487 (11th Cir. 1985)(publicity in a small, rural community of 7,059 people in rape, robbery, and murder trial where extensive print and broadcast media, as well as word-of-mouth communication within community; court also found publicity had been calculated to provoke or reflected an atmosphere of hostility); United States v. Abrahams, 453 F. Supp. 749 (D.

Mass. 1978)(publicity regarding defendant's unlawful
behavior, prior convictions and other charges pending
against him so pervasive venue ordered changed to another
state, irrespective of government's concession that a more
minor change in venue would have been appropriate); Campa,
459 F.3d 1121 (11th Cir. 2006) (11th Circuit, en banc,
holding that pretrial publicity not so pervasive and
inflammatory so as to give rise to a presumption of
prejudice, and district court's decision not to accord
substantial weight to results of survey conducted by defense
expert was a decision entirely within its prerogative);
United States v. Florio, 13 F.R.D. 296 (S.D.N.Y.,
1952)(court granting change of venue agreed upon by the
parties, where pervasive publicity for several days
preceding trial, becoming most intense on morning of trial,
including information about defendant's past and events
unassociated with the crime charged); United States v.
Tokars, 839 F. Supp. 1578 (N.D. Ga. 1993)(media reports had
saturated the local market, 66.6% of persons surveyed who
had heard or read about defendant's case had formed an
opinion as to his guilt or innocence as to related state
murder charge, 97.9% of those who had an opinion believed
him to be guilty, while 53.3% of persons surveyed who had

23

heard or read about defendant's case had formed an opinion
as to his guilt or innocence as to federal charges, 99% of
those who had an opinion believed him to be guilty), aff'd.
by 95 F.3d 1520 (1996), and cert. denied, 520 U.S. 1132
(1997); United States v. Engleman, 489 F. Supp. 48 (E.D. Mo.
1980)(allowing change of venue where specific testimony of
essential witnesses has been outlined in the press, wide
dissemination of highly inflammatory evidence shortly before
trial, with publicity not abating and likely continuing);
United States v. Holder, 399 F. Supp. 220 (D.S.D.
1975)("Wounded Knee" prosecutions, "deeply-rooted" passions
and "deeply-held" prejudice necessitated a change in venue);
and Calley v. Calloway, 519 F.2d 184 (5th Cir. 1975)(My Lai
massacre;
even though massive publicity, finding that "prominence does
not necessarily bring prejudice," and noting that no court
had found that the only impartial juror is an uninformed
one), cert. denied, 425 U.S. 911 (1976).

CONCLUSION

In conclusion, the United States contends that the
defendant has not demonstrated that the publicity in this
case is so inherently prejudicial that trial proceedings
must be presumed to be tainted without a change in venue.

24

This the 22nd day of January, 2010.

                          Respectfully submitted,

                          ANNA MILLS WAGONER
                          United States Attorney


                          /S/ CLIFTON T. BARRETT
                          Assistant United States Attorney
                          Chief, Criminal Division
                               NCSB #12858


                          /S/ SANDRA J. HAIRSTON
                          Assistant United States Attorney
                          Deputy Chief, Criminal Division
                          NCSB #14118

                               P. O. Box 1858
                               Greensboro, NC  27402

                               336/333-5351__

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA          :
                                  :          SUPERSEDING
              v.                  :          1:08CR384-1
                                  :
DEMARIO JAMES ATWATER             :

### CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2010, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, and I hereby certify that the document was delivered to the following:

Gregory Davis, Esq.
Assistant Federal Public Defender
Senior Litigator

Kimberly C. Stevens, Esq.


                    /S/ CLIFTON T. BARRETT
                    Assistant United States Attorney
                    Chief, Criminal Division
                    United States Attorney's Office
                    Middle District of North Carolina
                    P.O. Box 1858
                    Greensboro, NC  27402
                    Phone:  336/333-5351


26