IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 1:08CR384-1 |
| | ) | |
| | ) | |
| DEMARIO JAMES ATWATER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S RESPONSE TO MOTIONS TO QUASH

COMES NOW the Defendant, by and through undersigned counsel, and hereby opposes the motions to quash filed by WSOC Television, Inc. ("WSOC") on or about February 16, 2010; the motion to quash filed by Paxton Media Group, LLC, The News and Observer Publishing Company, The DTH Publishing Corp., Capitol Broadcasting Company, Inc., Media General Operations, Inc., and Cooke Communications in North Carolina (collectively, "Media") on or about February 26, 2010; and the Motion to Quash filed by WTVD Television, LLC on March 2, 2010.

Collectively, these three movants (which include, notably, WRAL-TV and WRAL-FM, the Durham Herald Sun, the Daily Tarheel and the Winston-Salem Journal, among many others) seek to deprive the Court of the production of at least 3,000 broadcasts or articles as evidence relevant to the Defendant's Motion to Transfer Venue (Docket Entry 52).

The motions before the Court seek to quash subpoenas issued pursuant to Rule 17 of the Federal Rules of Criminal Procedure. Those subpoenas were issued in order to preserve the Defendant's right to a fair trial pursuant to the Fifth, Sixth and Eighth Amendments to the United States Constitution.  For reasons identified and discussed below, the motions should be denied and the subpoenas enforced as written.

**A.  Presumed Prejudice Review Requires Access to Available Evidence for the Defendant to Meet His Burden and This Court to Perform Its Duty**

Prejudice to a defendant's right to a fair trial may be presumed from the publicity itself where "extreme circumstances" of pretrial publicity have saturated the community.  *United States v. Higgs*, 353 F.3d 281, 308 (4th Cir. 2003); *United States v. Jones*, 200 Fed. Appx. 231, 232-33 (4th Cir. 2006).  The burden of showing this unfairness is borne by the defendant: "it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside . . . ."  *Rideau v. Louisiana*, 373 U.S. 723, 733 (1963)(quoting *Adams* v. *United States ex rel. McCann*, 317 U.S. 269, 281 (1942)).  *See also Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966); *Higgs* at 308.  Thus, the Defendant has the burden of bringing before the Court the publicity itself, and evidence of how that publicity has saturated the community (that is, the circulation figures for the broadcast media).

2

If ever there were a case of "extreme circumstances" sufficient to justify a change of venue, this case is it. This is only underscored by the media's resistance to the production of so many broadcasts and articles that they claim it nearly impossible – this, though the media saw fit to create and air the broadcasts they now claim cannot be produced to this Court in support of a motion necessitated by their conduct.

### 1.   A STRINGENT STANDARD FOR PRESUMED PREJUDICE DEMANDS AN OPPORTUNITY TO MEET IT

The "extreme circumstances" standard demands that the Defendant produce the evidence which supports his motion. It is not for the press to argue the relevance of the evidence, or assert boldly that the Defendant cannot meet the standard necessary for a change of venue, while at the same time withholding the evidence necessary to support the Motion to Transfer Venue. The evidence sought here is the very *basis* of the Motion to Transfer Venue.

The affidavit of Steve Hammel, general manager of WRAL-TV in Raleigh, notes that "A preliminary review of our records reveals that we have broadcast more than *a thousand stories on the Eve Carson murder and prosecution*." Document 169, Affidavit of Steve Hammel, paragraph 3 (emphasis added). Hammel's affidavit then states that "essentially all of the video and interviews that were broadcast can be found on our web site,

3

which is publicly available free of charge." (Hammel Affidavit, paragraph 5).

Counsel has accessed WRAL's website in response to this contention. By our count, as of March 2, 2010, WRAL's website has what they call 74 Latest Stories, 49 videos, a timeline, 22 documents and audio, 24 stories under "Duke Connection," a subsection called "Probation Probe" that has 63 stories, 5 related documents, and 5 related links to WRAL Archives, including Eve Carson Homicide; WRAL Archive, Mahato Homicide; NC Department of Corrections Division of Community Corrections, February 10, 2009 Bill Draft for Warrantless Searches of Probationers; and Department of Correction News Conference on Probation Probe. There are 12 other links not under Probation Probe but on the main page. Those are: Eve Carson Murder Case Timeline of Events, WRAL.com Archives State Probation Probe; Suspect Photos in Eve Carson Homicide; Suspect Photos Demario Atwater; Photos Remembering Eve Carson; Your Photos: Eve Carson; Carolina Tears; Eve Carson 1985-2008, UNC Website; the Daily Tarheel Tribute to Eve Carson; Carolina Week Eve Carson Archives; Eve Carson for Student Body President (website); and Eve Carson's Inauguration – Carolina Week via You Tube. There are not 1,000 television broadcasts available for public download on that website that counsel can determine. There is no way that counsel can tell from the website what stories ran

4

on what date or how often each broadcast ran or whether every broadcast that WRAL-TV aired publicly is available on-line. Counsel cannot tell exactly how many broadcasts were aired via television to the viewing public throughout North Carolina.

Research to date has failed to reveal a published court decision involving a motion to transfer venue where just *one* of the many media outlets covering the story has publicly aired **a thousand broadcasts about a single case in a two year period.**

Unless this Court is prepared to grant the Motion to Transfer Venue based upon the evidence received to date, the potential effect of these motions to quash is the waylaying of potentially decisive evidence of "extreme circumstances" -- evidence that might otherwise demonstrate that Mr. Atwater cannot obtain a fair trial in this State. Its more lasting effect is to serve notice that the presumed prejudice standard is a hollow provision of due process: the accused can be denied the protection of the law by the very media outlets withholding the evidence that necessitated the need for protection from the Courts.

## 2. THE WITHHOLDING OF AVAILABLE EVIDENCE UNDERMINES THE FUNCTION OF THIS COURT

"Whenever it appears that shortly before a trial public news media in the community have published incompetent and prejudicial information about the case or the defendant, a duty

5

devolves upon the trial court to make certain that the necessary conditions of a fair trial have not been impaired." *United States v. Milanovich*, 303 F.2d 626, 629 (1962). The need to "make certain" requires close analysis of all available evidence. The *presumption* of prejudice presupposes a developed record; Courts considering and granting motions to transfer venue have done so only after reviewing a substantial record. *See*, *e.g.*, *Irwin v. Dowd*, 366 U.S. 717, 757 (1961)(granting motion to transfer venue after reviewing 46 exhibits, including newspaper headlines, cartoons, and articles); *Rideau* at 725 (granting motion to transfer venue after reviewing broadcasted film of police interrogation and defendant's admission); *Sheppard* at 342 (granting motion to transfer venue after reviewing five volumes of newspaper clippings); *United States v. Cortez*, 251 F.R.D. 237 (E.D. Tex. 2007)(granting motion to transfer venue after reviewing print and television media as well as internet websites of local news outlets); *Daniels v. Woodford*, 428 F.3d 1181, 1211 (9th Cir. 2005)(granting motion for transfer of venue after reviewing record of articles and news accounts); *United States v. Moody*, 762 F. Supp. 1485, 1488, n.3 (N.D. Ga. 1991)(granting motion to transfer venue after reviewing five volumes containing 458 newspaper articles as printed in 12 newspapers); *Coleman v. Kemp*, 778 F.2d 1487, 1491- 1540 (11th Cir. 1985)(granting motion to transfer venue after

6

reviewing dozens of news accounts in several newspapers,
magazines, and radio broadcasts, and noting that it did not
review television broadcasts only because the television
stations destroyed them after 1-2 years).

Courts granting motions to transfer venue for presumed
prejudice have based their decisions on a strong record.
Accordingly, this Court should maximize the evidence available
for its review and deny the motions of WSOC, Media and WTVD.

## B.   The Subpoenas are Relevant, Admissible, and Specific for Purposes of An Evidentiary Hearing

As a threshold matter, WSOC contends that the subpoena did
not, as required by Rule 17 Fed. R. Crim. P., include the seal
of the Court.  It is counsel's understanding that a proper copy
bearing the Seal of the Court was served by the Federal Public
Defender's Office.  WSOC also argues that neither an attendance
fee nor mileage allowance was tendered.  However, that was
excepted by Order of this Court, as attached to the subpoena
that WSOC received.

### 1.   MR. ATWATER MEETS THE BURDEN OF PERSUASION

In reviewing a motion to quash a trial subpoena, the burden
is on the subpoenaing party to demonstrate that it is relevant,
admissible, and specific.  *United States v. Nixon*, 418 U.S. 683,
700 (1974); *United States v. R. Enterprises*, 498 U.S. 292, 296
(1991).

7

The very purpose for an evidentiary hearing to determine presumed prejudice is to review evidence and determine relevance and admissibility.  The standards of relevancy and admissibility, therefore, do not serve the same gatekeeping function that they do at trial.  Instead, the inquiry of relevance and admissibility for presumed prejudice seeks to determine what evidence is relevant and admissible *for purposes of the motion to transfer venue*.  The publicity itself is the very basis for the Defendant's Motion to Transfer Venue and is, of course, relevant – in fact, the very core – of the dispute at hand. That the Court will distinguish some materials as relevant and admissible evidence necessitating a change in venue, and others as unpersuasive implies that the determination is made after parties have complied with subpoenas and the information produced.

Here, all of the information requested, as detailed at great length in Mr. Atwater's memorandum accompanying his motion to transfer venue, is relevant and admissible for purposes of the determination of the Motion to Transfer Venue.  It is also sufficiently specific.  Counsel for Mr. Atwater painstakingly specified every party, event, and medium for which he seeks information, and defined a window of time within which to comply as determined by the deadlines set by this Court.

8

Media cites *Nixon* for the propositions that the subpoenaing party exhaust available avenues for otherwise obtaining the information requested, that the information be vital to trial preparation, and that the subpoena be tendered in good faith. Counsel for Mr. Atwater have attempted to provide a sample of the publicity to this Court. As Media itself asserts in its Memorandum In Support of Motion to Quash, "[i]n support of this motion, the defendant has submitted . . . hundreds of news stories on the subject matter, all of which were obtained without the aid of a subpoena." (Mem., at 3).

Indeed, counsel have performed research in an effort to provide a sample of the publicity, but it would be impossible for counsel to tender to the Court all of the publicity – or even assure the Court that it has tendered a representative sample of the complete coverage -- without the tool of the subpoena. Further, counsel for the Defendant are not certain that they have produced for the Court all of the inflammatory and improper broadcast material that the public has viewed. Counsel does not have access to the information possessed by the media as to how many articles or broadcasts each outlet has published, nor can counsel adequately relay to the Court the content of all of those articles or broadcasts. That the information the subpoenas seek is vital for trial and pre-trial purposes is clear. While that information is not sought for use

9

at the trial itself, it is intended to help Mr. Atwater secure a
fair trial.  Counsel for Mr. Atwater issued the subpoenas in
good faith.

## 2. ALTERNATIVELY, THIS COURT SHOULD CONSIDER THE SUBPOENAS PRESUMPTIVELY REASONABLE

In the alternative, if this Court does not find Mr. Atwater
meets the above burden of persuasion, it should apply the
standard that applies to grand jury subpoenas.  A grand jury
subpoena is presumptively reasonable and the burden of
persuasion in a motion to quash is upon the party resisting it.
*United States v. R. Enterprises, Inc., et al.*, 498 U.S. 292, 301
(1991).  The Supreme Court explained its treatment of grand jury
subpoenas by noting that:

> the government cannot be required to justify the
> issuance of a grand jury subpoena by presenting
> evidence sufficient to establish probable cause
> *because the very purpose of requesting the information*
> *is to ascertain whether probable cause exists.*

*Id.* at 297 (emphasis added).

The very purpose of requesting information in support of
the Motion to Transfer Venue *is to ascertain whether presumed*
*prejudice requiring a change of venue exists*. The reasons for
such an inquiry are analytically identical to that of a grand
jury indictment.  Presumed prejudice, like probable cause,
cannot be established until the evidence is weighed and
considered.  The hybrid subpoenas at issue here are not trial

10

subpoenas.  They do not seek to produce information for trial, but in support of a pre-trial motion or evidentiary hearing.  As it does with grand jury subpoenas, this Court should determine the subpoenas at issue to be presumptively reasonable, with the burden on the resisting party to demonstrate their alleged unreasonableness or oppressiveness.

## C.   WSOC, Media and WTVD Have Not Demonstrated Adequate Grounds for Resisting the Subpoenas at Issue

WSOC, Media and WTVD object to the subpoena on essentially two grounds: unreasonableness and oppressiveness.  First, they deny the relevancy and importance of their reporting to Mr. Atwater's motion to transfer venue.  Second, they cite the prohibitive administrative burden and cost of producing the evidence.  Both bases fail and do not relieve the parties from complying with the subpoena.

### 1.   THE SUBPOENAS ARE REASONABLE AND DETERMINATIONS OF RELEVANCE ARE FOR THIS COURT

In its motion, WSOC expresses doubt that Mr. Atwater "has or will be able to show that given the extreme costs and unreasonable burden which would be placed on WSOC, that the actual content of the broadcasts would be evidentiary, highly relevant and going to the heart of the issue at hand."  (Mot. 3, ¶ 7).  Likewise, Media contends that "the subpoenas are unreasonable because they seek information that is not needed by

11

the court related to the defendant's Motion for Change of Venue". (Mem. 2).

This is easy for them to claim when they refuse to produce their broadcasts for this Court. How can these entities argue that their broadcasts are "not needed by the court" without producing the coverage itself? How can the Court determine whether the publicity is prejudicial, without having the publicity itself?

Mr. Atwater shares the movants' concerns that only relevant, germane evidence be showcased in this Court. However, as discussed in the preceding section, *supra*, the only way Mr. Atwater can show the relevancy and importance of the media coverage at issue *is to first show the media coverage*. WSOC effectively fights Mr. Atwater's ability to prove relevancy by claiming that its administrative burden hermetically seals relevancy from ever being exposed. The Court can never reach the relevancy issue, WSOC contends, because Mr. Atwater's request cannot first pass the objection to administrative burden. As discussed in this document, *infra*, the objection to administrative burden fails.

It is precisely for reasons of relevancy that Mr. Atwater has subpoenaed WSOC, Media and WTVD, among other parties.

There is substantial reason to believe that the content of WSOC, WTVD, and Media's television broadcasts and newspaper

12

articles contain evidence that would not be competent in a court of law during the guilt / innocence phase of Mr. Atwater's trial.  Two types of television news broadcasts alone in the instant case are equivalent to the videotaped confession at issue in *Rideau*.  First, there were broadcasts reporting Atwater's supposed admission to Chapel Hill police investigators that he was in Chapel Hill the night Eve Carson ("Carson") was killed, according to the search warrant affidavits, and that he was in Carson's Toyota Highlander.  Second, there were other broadcasts of confidential informants attributing Atwater as stating he and Lawrence Alvin Lovette abducted Carson from inside her house.

These broadcasts are particularly grave.  They and other media reports raise the concern that citizens of this State have been embittered against Mr. Atwater, effectively precluding his right to a fair trial.  The citizenry's strong feelings are evident in their comments posted on-line, without solicitation, on the various media's websites and previously tendered to this Court.  As detailed at greater length in Mr. Atwater's memorandum of law accompanying his motion to transfer venue, media coverage has been akin to the "editorial artillery" aimed at the defendant in *Sheppard*.  *Sheppard* at 339.  To date, media coverage has included the following:

13

- That Atwater allegedly fired the shot that killed Carson.

- That Atwater was on probation at the time he allegedly killed Carson.

- That Atwater was on parole at the time he allegedly killed Carson.

- That the probation and parole system failed by allowing Atwater to be on the streets at the time they say he killed Carson.

- That Atwater had a "long criminal history."

- That the autopsy shows that Carson likely shielded herself from the fatal blast by raising her hand.

- That Carson was shot by two different weapons, a handgun and a shotgun.  That Atwater allegedly shot her in the face with a shotgun.

- That Chapel Hill police investigators interviewed Atwater and he admitted he was in Chapel Hill the night Carson was killed, according to the search warrant affidavits, and also said he was in Carson's Toyota Highlander.

- That Atwater admitted to Chapel Hill police investigators that it was him who was pictured in a surveillance photo taken at a BP convenience store allegedly using Carson's ATM card after the murder.

- That Atwater had a significant criminal history engaging in unlawful conduct as his primary source of income and committed the homicide while he was on probation.

- The press has errantly reported that Atwater killed a Duke University Graduate Student, Abhijit Mahato, approximately 6 weeks before the Carson homicide.

- That Atwater incurred infractions after his arrest at Central Prison, with nine noted infractions between July and September, including lock tampering, gang involvement, threatening staff and using profanity.

- That Carson was shot five times.

- That Atwater is "guilty" of probation violations.

14

- That Atwater was on "parole" and facing additional criminal charges when, police suspect, he targeted Carson on March 5 and left her dead on a street in a Chapel Hill neighborhood.

- That Atwater is a glaring example of a poorly handled probation violation.

- That Atwater had a criminal record that pointed to an escalation in the type and severity of crimes they might be involved with in the future.

- That Atwater had been arrested in the past for which no convictions have been obtained, including that he was arrested by Raleigh police and charged with stealing a Savage rifle and Martin 12-gauge shotgun; that Atwater was arrested by Butner police when they found him with a .40 caliber Hi-point handgun; that Atwater was arrested by the Durham police and charged with felony gun violation and marijuana possession.

- That the Carson murder has prompted a $2.5 million probation reform because Atwater was on probation at the time of her murder.

- That Atwater allegedly saw lights on and the blinds raised in Carson's house.

- That confidential informants attribute Atwater as stating he and Lovette abducted Carson from inside the house.

- That Carson was driven to Hillcrest Road where she was shot four times with a .25 caliber semi-automatic pistol and once with a sawed-off 12-gauge shotgun.

- That Carson was shot in the right shoulder, right upper arm, right buttocks, and right cheek and once at close range in the right temple.  She also sustained a wound to her right hand - likely because she used it to cover her face.

- That Atwater is identified as the man in the convenience store photos.

- A photograph of Atwater was repeatedly displayed where the media claims he was using Carson's ATM card.

15

- That search warrants indicate a confidential informant told investigators that Atwater admitted to abducting Carson from her home and that both he and Lovette shot her multiple times.

- That Carson was particularly vulnerable when Atwater fired a single shotgun round from close range through the victim's hand and into her brain.

- That Atwater and Lovette forced Carson into the backseat of the Toyota Highlander and drove her to the ATM machine.

- That police taped a cell phone call in which Atwater talked to an informant about his involvement in the crime.

- That police have probable cause to believe that a sexual assault of an unknown nature occurred.

- That Carson was tortured prior to being killed.

- That a criminal profiler, Michael Teague, was quoted by the press as saying that the manner in which Ms. Carson was shot showed "a complete lack of regard for the other person.  I don't see any element from going through the autopsy that there was any concern for this victim.  It's just like she was the repository for their anger, and how dare she say no to them, whatever she said no to them for."

- That Atwater shot Carson in the head with a 12-gauge shotgun after he and Lovette kidnapped Carson and drove her to several ATMs.

- That Atwater had been seen with the murder weapon before and after the crime.

- That Atwater is involved in gang activity.

- That Carson was forced into the back seat of the Toyota Highlander and that that is consistent with ATM videotaped footage.

    *See* the Defendant's Motion to Transfer Venue, Docket Entry

52.

WSOC, WTVD and Media's coverage may very well have contained some or all of the items enumerated. Additionally, there may be further information contained in their coverage of which Mr. Atwater is currently unaware. Mr. Atwater takes great issue with the press' pronouncements of relevancy and importance. Their duty is to comply with the subpoena or properly support a motion to quash. It is for this Court to make the ultimate determinations of relevancy of the materials to the issue of whether venue should be transferred prior to jury selection once the Court is supplied with the evidence of the publicity itself. Therefore, this Court should deny the motions.

## 2. THE SUBPOENAS ARE NOT OPPRESSIVE WHERE MOVANTS CITE COSTS AND TIME CONSTRAINTS THAT ARE VAGUE AND CONCLUSORY

WSOC and Media argue that the subpoenas are oppressive. Both WSOC and Media have cited time and cost as administratively prohibitive. In addition, Media invokes the public availability of information and impact the subpoenas have on freedom of the press as grounds for why the subpoenas at issue are oppressive. All four arguments fail here.

WSOC's motion is representative of the complaints voiced by most of the subpoenaed entities. First, in its motion it claims that based on past experience, it can project that it would take a month for an "experienced editor" to compile the information

17

requested by Mr. Atwater. (Mot. 2, ¶5). It does not explain its methodology in determining this figure for the court to assess its validity. There is no mention of the technology used, employees assigned, or nature of the discovery requests of past experiences. Nor is there a comparison of those past conditions to WSOC's current capabilities. Representatives of several entities comprising Media did note in affidavits the type of technology they would use in compiling information. *See e.g.* Aff. of James Edwards, publisher of *The Daily Dispatch*. Even in these instances, however, there was no meaningful mention of how any of these entities derived the number of hours they claim it would take employees to gather the requested information. This deficiency becomes particularly acute when the number of hours is multiplied by hourly wage to put a price on compliance.

WSOC and Media have not adequately accounted for alternative arrangements to alleviate their burdens of time and cost. Counsel for the Defendant arranged an agreement with Fox Charlotte to provide transcripts of its broadcasts instead of the broadcast footage originally requested. There are other possible methods the movants have not entertained. For example, they fail to consider a rotation of employees assigned to the task so that no one employee is away from primary duties for too long.

18

Second, WSOC and Media have provided little to support the specific estimates they make as to the exact cost and time anticipated. Typically, they suggest a figure without explaining it. This Court should protect against WSOC and Media double-counting in their valuation. If the $5,000 figure mentioned by WSOC in its motion, for example, is part of a predetermined salary, it should not be counted in total expense. (Mot. 3, ¶5). Instead, the expenses triggered by the subpoena to be calculated by WSOC and Media and assessed by this Court are solely the increased costs related to paying or hiring employees to copy for the Court the requested information. With the exception of Raye P. Woodin III, publisher of *The Rocky Mount Telegram*, none of the media entities subpoenaed even hazards a guess at the additional cost of hiring the additional help they claim they need. (Aff. Raye P. Woodin III 1, ¶ 4). Nor is there any mention as to whether the burden may be avoided with an alternative arrangement.

Finally, many other television stations and newspapers *have* complied with the very same subpoena, without complaining of oppressive or unfair burdens. *See, infra*, and Exhibits attached hereto containing compliance letters and affidavits describing materials provided by various media outlets.

3. **PUBLIC AVAILABILITY OF INFORMATION DOES NOT RENDER THE SUBPOENAS OPPRESSIVE AND ON BALANCE "REPORTER'S PRIVILEGE" IS TRUMPED**

19

Media asserts that the public availability of much of the information requested renders the subpoenas oppressive. This is a specious argument. First, as argued elsewhere in this brief, *supra*, counsel for Mr. Atwater have thoroughly combed news publications for information that counsel could gather. Counsel did not, however, make a systematic search of all published media in the State. Counsel cannot undertake such a task as they do not have the means to do so.

Second, Media's contention assumes familiarity and acquaintance with the search process for each media outlet. What an experienced employee might locate in minutes, knowing what she is looking for, could take an unpracticed individual hours or days. Third, some of the publicly available information is beyond the outer boundaries of accessibility and convenience. *See e.g.* Aff. of Felicia Gresette (offering bound copies of *Chapel Hill News* at its Franklin Street office for public perusal). Document 163.

Media cites to *Ashcraft v. Conoco, Inc.,* 218 F.3d 282, 287 (4th Cir. 2000) as guidance for the analysis this Court should undertake with respect to the impact of the subpoenas on its First Amendment rights. Mr. Atwater's subpoenas have sought only publicly broadcast material. There is no First Amendment infringement here. Mr. Atwater has not sought any confidential

20

interviews or other materials protected by the First Amendment. Rather, Mr. Atwater has sought only what the press decided to broadcast to the public. Once the media has released materials to the public by broadcasting the content of their stories, they have lost any First Amendment protection attaching to the materials.

As Media concedes, this Court is not bound by *Ashcraft*, a civil case. Even if this Court does find the case instructive, however, its analysis lends heft to Mr. Atwater's argument, not Media's. It essentially rehashes the same issues of relevancy, public availability of sources, and needs already addressed in this document.

The three-pronged test recognized by the Fourth Circuit in *Ashcraft* comes down firmly on the side of Mr. Atwater. In that analysis, a court is to consider:

(1) whether the information is relevant;

(2) whether the information can be obtained by alternative means; and

(3) whether there is a compelling interest in the information.

*Id.* at 287.

First, as established in this brief, *supra*, the information sought by the subpoenas for use as evidence in support of the Motion to Transfer Venue is by its nature relevant. Second,

21

that the information is publicly available is not dispositive. Knowledge of the search apparatus, cost of access, and travel time can render access to publicly available information impracticable. Thirdly, Mr. Atwater's right to a fair trial in this case -- where life or death is at stake -- could not be a more compelling interest.

With regard to WTVD's motion to quash, they claim that the Defendant can go to their website and locate stories, videos and public comments related to Eve Carson, Demario Atwater and Lawrence Lovette. This does not, however, provide the Court with the broadcasts aired on WTVD, the content of those broadcasts, the date of those broadcasts, the total number of broadcasts or the circulation figures for their station. WTVD claims that its "computer archive" (to which the Defendant does not have access) shows over 100 broadcasts related to this case, which includes duplicate broadcast reports in a single day. Only WTVD can provide those broadcasts to the Court, along with the dates and times that the broadcasts were aired, and to whom the stories were broadcast. This is relevant information for the Court. WTVD admits that its broadcast news reaches 23 counties in central and Eastern North Carolina, thus impacting the viewers in the Middle District and throughout the Eastern part of the State. Their broadcasts are necessary for determination of the Motion to Transfer Venue. They appear to

be otherwise unavailable in their entirety to the Defendant.
Counsel for the Defendant is unable to locate the 100 broadcasts
aired by WTVD by checking their website.  WTVD's 83 web articles
related to the Eve Carson matter that appear on their website
still do not provide the Court with the evidence contained in
the "over 100" broadcasts aired to the viewing public by WTVD.
Nor does it tell the Court when the broadcasts were aired, or to
whom they were shown.  While WTVD claims it would take their
employees 3 to 5 business days to run the broadcasts in real
time, they have not addressed whether their station can burn
copies digitally – a much quicker process than burning the
stories in real time to videotape.

### 4. COOPERATING WITH REQUESTS FOR INFORMATION IS A SOCIAL RESPONSIBILITY OF DOING BUSINESS IN THIS STATE

Basic notions of fairness and responsibility work to
further defeat movants' objections.  WSOC, Media and WTVD chose
to air and thereby profit from reporting on one the biggest
stories aired by the press in recent North Carolina memory.  For
almost two years, the businesses have made money from pumping a
stream of information on this case so steady and so prolific
they now claim they cannot retrieve it.  In short, WSOC, Media
and WTVD claim that their coverage is too big to track.  This is
a sorry and insufficient basis for objection.

23

It also unacceptably surrenders a large portion of our criminal justice system to the province of the media. The presumed prejudice standard for change of venue was created in large part in this case by the media. Granting motions to quash like the ones filed here would erode the presumed prejudice mechanism developed to preserve the right to a fair trial.

It should also be noted, as an example, that WGHP-TV ("WGHP"), a Fox affiliate broadcasting in the Piedmont Triad area, willingly complied with a similar subpoena requesting similar discovery production with no objection. WGHP supplied a DVD with over two hours of media broadcast coverage. The materials forwarded by various media outlets in response to the Defendant's subpoenas are being copied and will be provided to the Court as promptly as counsel is able to file those materials. UNC-TV has complied with the defendant's subpoena voluntarily and provided eleven dvd's of video coverage of the Eve Carson case. Fox Charlotte has provided transcripts of all of its broadcasts. WBTV has provided scripts from all of the broadcasts that it aired. Other stations have complied as well. See Exhibits Attached to this Document which include cover letters and affidavits from various stations that were able to comply with their subpoenas without complaint and as part of their civic obligation to the Court system.

Mr. Atwater seeks the media broadcasts and newspaper articles themselves that may have contributed to the climate of publicity that is at the heart of his motion to transfer venue. Unless the Court finds that it has before it sufficient evidence at this point to grant the Motion to Transfer Venue, it would be premature for this Court to rule on the motion to change venue without reviewing all available evidence. Content currently in the possession of WSOC, Media and WTVD will help provide the basis for determining whether presumed prejudice exists in this State. Mr. Atwater's request is not an outrageous one. Indeed, other media outlets have been able to competently meet it with a very swift and respectful turnaround.

For the foregoing reasons, this Court should deny WSOC's, WTVD' and the Media's motions to quash and enforce the subpoenas as written.

Respectfully submitted this the 3rd day of March, 2010.

/s/ Gregory Davis
GREGORY DAVIS
Senior Litigator
North Carolina State Bar No. 7083
251 N. Main Street, Suite 849
Winston-Salem, NC 27101
(336) 631-5278
E-mail: greg_davis@fd.org

/s/Kimberly C. Stevens
Kimberly C. Stevens
Attorney for Defendant
NC State Bar No. 20156
532 Ivy Glen Dr.
Winston-Salem, NC 27127

25

```
336-788-3779
Email: kimstevensnc@aol.com
```

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Mr. Clifton T. Barrett
Assistant United States Attorney
P. O. Box 1858
Greensboro, NC 27402

Respectfully submitted,

/s/Kimberly C. Stevens
Kimberly C. Stevens
Attorney for Defendant
NC State Bar No. 20156
532 Ivy Glen Dr.
Winston-Salem, NC 27127
336-788-3779
Email: kimstevensnc@aol.com

27